## United States District Court, District of Nebraska

| | |
|---|---|
| **Steven Chace,** | **Case No. _____** |
| **Plaintiff,** | |
| v. | **Complaint** |
| | **&** |
| **Magellan Ammonia Pipeline, L.P.,** | **Jury Demand** |
| and, | **&** |
| **Magellan Midstream Partners, L.P.,** | **Trial Location Designation** |
| And, | |
| **Magellan Doe Company,** | |
| **Defendants.** | |

Plaintiff alleges:

1. This is an action for personal injuries and property damage arising out of an October 17, 2016 Release of anhydrous ammonia from Defendants' pipeline at a location nearby Plaintiff's rural Burt County, Nebraska, residence ("Release"). The Release was the result of the Magellan's negligence.

2. As a proximate result of the Release, Plaintiff Steven Chace sustained temporary and permanent physical and emotional injuries, property damage, and both general and special damages for which recovery is necessary. He was nearly killed, fled on foot for his life after and as he reported the Release, and watched his neighbor's death occur at a point too far from his location to intervene.

3. Before the Release Mr. Chace also reported circumstances suggesting, strongly, a pipeline leak and requiring Defendants' prompt attention and repairs. This occurred twice before the deadly spill occurred. The Defendants were indifferent to the circumstances; they responded belatedly and did not make responsible repairs. Judgment is sought for Mr. Chace's general and special damages.

## Jurisdiction, Venue, Parties

4. **Jurisdiction.** The United States District Court has subject matter jurisdiction pursuant to 28 *USC* § 1331 as questions of liability under federal law are present. In addition, jurisdiction lies under 28 *USC* § 1332 because Mr. Chace is a resident of Nebraska. Defendants have their principal place of business at Tulsa, Oklahoma. There is complete diversity of citizenship between the parties. The actual amount in controversy, exclusive of interest and costs, exceeds $75,000.

5. **Venue** is proper in this Court under 28 USC § 1391(b)(2) because Mr. Chace resides here and a substantial part of the activities and injuries giving rise to the Mr. Chace's claims against the Magellan companies occurred here. Defendants engage in business, and caused tortious injury to Mr. Chace in Nebraska.

6. **Parties.** The Plaintiff is Steven Chace. Mr. Chace is a single person and resides in Burt County, Nebraska where the claims arose. He owns, and at all relevant times except when excluded from his residence and premises by the dangers caused and permitted by Magellan, resided in a residence located upon:

> W1/2, SW1/4, north of public road in Sec. 1, Township 22, North,
>
> Range 10 East of the 6th P.M., Burt County, Nebraska

The residence on the real estate was constructed before he purchased the real estate.

7. The **Defendants** are:

7.1. **Magellan Ammonia Pipeline, L.P.,** a Delaware limited partnership which is authorized to do business in Nebraska and is registered with the Nebraska Secretary of State as Entity no. 10021717. Its Registered Agent to receive process in Nebraska is CT Corporation Systems, 5601 S. 59th St., Lincoln NE 68516.

7.2. **Magellan Midstream Partners, L.P.,** a Delaware limited partnership which is authorized to do business in Nebraska and is registered with the Nebraska Secretary of State as Entity no. 10018187. Its Registered Agent to receive process in Nebraska is CT Corporation Systems, 5601 S. 59th St., Lincoln NE 68516.

CY9945.02

> 7.3.    **Magellan Doe Company.** This company's true name or actual existence, are not known. In 2004 when this Court entered a consent decree, a 3rd company known as Enterprise Product Company (Nebraska Sec. of State Entity no. 10044077) existed and was involved in the operations of the ammonia pipeline. More discovery is required to determine what role, if any, the Magellan Doe Company has and to identify and substitute the Company for the Doe Magellan. Defendants' Rule 26 initial disclosures should reveal this information.

The Defendants are referred to collectively as "Magellan". Their acts and omissions are believed to have been the product of joint and concurrent activities, and involved shared control, operations and supervision of the anhydrous ammonia pipeline. They are jointly and severally liable.

   8.    Magellan's offending pipeline leaked and Released dangerous toxins as described below from a point along the pipeline a short distance north of the County Road in and a shorter distance north of the Defendants' valve station, in:

   E1/2, SE1/4, Sec. 2, Township 22, North, Range 10 East of the 6th P.M.,

   Burt County, Nebraska.

This Release also occurred in close proximity to a monitoring well controlled by Magellan or a related party and used by them.

   9.    The Release of anhydrous ammonia from Magellan's pipeline that proximately caused the damages described below occurred on October 17, 2016 in Burt County, Nebraska.

## General Facts

   10.   Mr. Chace lives in a rural setting which he carefully selected for its natural beauty, remoteness, and opportunities to enjoy out-of-doors activities, including hunting and observation of wildlife and flora.

   18    Magellan operates one pipeline easement right-of-way that crosses the real estate described in ¶ 6. Three pipelines are present within the right-of-way. Two of these are for the transport of liquefied petroleum gas and may be operated by a subsidiary or

sibling entity to the Magellan Defendants. The other is a hazardous liquid pipeline bench transports anhydrous ammonia operated by Magellan. Anhydrous ammonia is a "hazardous liquid" as defined by 49 CFR § 195.2. Anhydrous ammonia is toxic and deadly to human beings. Even brief exposure to anhydrous ammonia causes burns and can cause lethal damage to the body if ingested through breathing.

11. Anhydrous ammonia is a highly volatile hazardous liquid that rapidly volatizes when released from a pressurized container, including a pipeline like the one in question. It is transported only under significant pressure. The anhydrous ammonia pipeline does not transport its cargo with gravity; instead, the cargo is pumped. The pipeline in question is not believed to be a low-stress pipeline. Regulations found at 49 CFR Ch 1 are applicable to the Magellan pipeline that ruptured and allowed the lethal Release of anhydrous ammonia described below.

12. Mr. Chace was, at all relevant times, physically fit, highly active, and an avid outdoorsman when not at his professional employment. Professionally, Mr. Chace works as an environmental scientist in an applied setting. He routinely deals with issues arising from pipelines and knows how to identify signs and signals that suggests the possibility of a leak. This can often involve death of the vegetation above the pipeline.

13. During late 2012, Mr. Chace became aware that vegetation over and emanating away from a point above Magellan's pipeline was dead and the death appeared to follow a pattern which suggested an anhydrous ammonia leak from the pipe.

14. Mr. Chace reported the suspected leak to Magellan in May 2013. He did not know whether a leak existed, but reported ammonia odors in the soil and dead vegetation. Magellan's crew, dispatched to investigate, identified the location of the suspected difficulty, exhumed the buried pipe, and after exposing the pipe identified the anhydrous ammonia leak in its pipeline at the point described in ¶ 7, above. Mr. Chace made this report because he suspected a leak, probably a pinhole leak, existed in the pipeline and required prompt, thorough evaluation and repair by Magellan.

17 Magellan's repair crew made a temporary repair. It did so by placing a collar with clamps over the area of the rupture. Mr. Chace witnessed this collar and

photographed it, expecting that it was a temporary repair only. A repair of this kind is not a reasonable permanent "fix" for a leak of anhydrous ammonia under pressure from within a pipeline.

18    Without Mr. Chace's knowledge, Magellan failed to make a permanent repair and buried the temporary one below the ground concealing it. Approximately three (3) years later, on the October 17 Release date, the previous temporary repair failed, a major disruption occurred, and the product was Released. Plaintiff believes the rupture occurred at the leak location identified three years earlier, but never completely repaired.

15.    The US Department of Transportation, Pipeline & Hazardous Materials Safety Administration ("PHMSA") issues regulations that govern pipeline safety. These regulations incorporate, by reference, a wide variety of publications including:

> (20) API Standard 1104, "Welding of Pipelines and Related Facilities," 20th edition, October 2005, (including errata/addendum (July 2007) and errata 2 (2008), (API Std 1104)), IBR approved for §§ 195.214(a), 195.222(a) and (b), 195.228(b).
>
> (23) API Standard 1163, "In–Line Inspection Systems Qualification" Second edition, April 2013, (API Std 1163), IBR approved for § 195.591.
>
> (3) ASME/ANSI B31.4–2006, "Pipeline Transportation Systems for Liquid Hydrocarbons and Other Liquids" October 20, 2006, (ASME/ANSI B31.4), IBR approved for §§ 195.110(a); 195.452(h).
>
> (1) ANSI/ASNT ILI–PQ–2005(2010), "In-line Inspection Personnel Qualification and Certification" reapproved October 11, 2010, (ANSI/ASNT ILI–PQ), IBR approved for § 195.591.
>
> (1) NACE SP0169–2007, Standard Practice, "Control of External Corrosion on Underground or Submerged Metallic Piping Systems" reaffirmed March 15, 2007, (NACE SP0169), IBR approved for §§ 195.571 and 195.573(a).
>
> (2) ANSI/NACE SP0502–2010, Standard Practice, "Pipeline External Corrosion Direct Assessment Methodology," June 24, 2010, (NACE SP0502), IBR approved for § 195.588(b).
>
> (3) NACE SP0102–2010, "Standard Practice, Inline Inspection of Pipelines" revised March 13, 2010, (NACE SP0102), IBR approved for § 195.591.

(4) NACE SP0204–2008, "Standard Practice, Stress Corrosion Cracking (SSC) Direct Assessment Methodology" reaffirmed September 18, 2008, (NACE SP0204), IBR approved for § 195.588(c).

(1) AGA Pipeline Research Committee, Project PR–3–805 "A Modified Criterion for Evaluating the Remaining Strength of Corroded Pipe," December 22, 1989, (PR–3–805 (RSTRING)). IBR approved for §§ 195.452(h); 195.587 & .588.

## Pipeline Failure

16. The anhydrous ammonia pipeline in question is believed to be a Category 1 pipeline with the nominal diameter equal to or greater than 8.625 inches and located in or within ½ mile of an unusually sensitive area. 49 CFR §195.2.2. The repair attempted by Magellan of a metal sleeve-style repair was fraught with danger and was temporary in nature. Nonetheless, Magellan breached the duty to resolve the problem by causing the pipeline system to resume proper, safe operations in accord industry best management practice standards and requirements of U.S. regulatory agencies including the Department of Transportation and the PHMSA.

17. Magellan was negligent in that they did not make its temporary repair effectively and did not make a permanent one, and instead left temporary clamps in place with the temporary sleeve-style repair. Magellan covered or re-interred the pipeline, with the unsafe easement upon it, and allowed it to return to use and they:

17.1. Failed to repair the leak in their pipeline when it was identified in 2013 or on a timely basis thereafter.

17.2. Failed to follow-up with subsequent investigations after the leak was reported in 2013 to be sure their attempt at remediation was successful.

17.3. Failed, after 2013, to monitor, ascertain changes in pressure and leaks.

17.4. Permitted, in 2013 the fractured, temporarily repaired line, to be reinterred, and then failed to permanently remediate by making permanent repairs, including replacement of compromised component parts.

17.5. Operated the pipeline when it was in an unsafe and unsound condition.

17.6. Operated the pipeline under load and unload pressures that were excessive.

CY9945.02

17.7. Operated the pipeline without adequate oversight, inspection, and remediation of an identified problem.

17.8. Permitted the pipeline to return to and remain in service with a less than adequate and temporary repair in place.

17.9. Failed to conduct pressure tests (e.g., in-line inspection device, or hydrostatic, tests) or inspections, or make appropriate observations based upon such tests, in accord with 49 CFR Pt 195, Subpart E.

17.10. Failed to follow up and test within the times demanded of immediate repair conditions, or conditions requiring repair within 60, or 180 days.

17.11. Failed to discover deformations, dents, pipe wall thickness deterioration, compromising corrosion, defective welds, or other anomalies in the pipe that failed in 2013 and again on October 17, 2016.

17.12. Failed to lower internal pressures and keep them below the minimum predicted failure pressure, the burst pressure, or the maximum safe operating pressure. 49 CFR §195.452(h) (4) and §195.45 1.6 2.2(b).

18. The safe and secure transportation of anhydrous ammonia requires that a pipeline operator provide the safety features and assurances required so for the safe transportation of hazardous liquid petroleum, and the gas, products. Magellan failed to do so. Discovery is required. Magellan's failures include but are not necessarily limited to the following acts and omissions which are directly applicable to liquid petroleum, and gas, pipeline safety and are generally less rigorous than those applicable to hazardous liquid pipelines. This underscores that failure to abide by and meet these requirements constitutes evidence of negligence. Magellan's acts and omissions also included:

**Failure to Adhere to Hazardous Liquid Pipeline Safety Criteria**

18.1. Failed to develop, adopt, and follow, the Liquid Integrity Management Rule, and with the elements required by 49 CFR § 195.452.

18.2. Failed to repair the pipeline at an identified failure point on a permanent basis after being notified by Mr. Chace of a leak.

7

18.3. Performed a temporary repair on the failure point found upon investigation of the report by Mr. Chace, but then there is the pipeline and failed to a) monitor and inspect on a proper basis, and b) failed to return to make a permanent repair and assure no continuing risks of weak spots and leaks.

18.4. Failed to conduct the steps necessary to protect against leaks and Releases in High Consequence Areas like the one adjacent to Mr. Chace's residence which is nearby both a highway of the National Highway Defense System, and the Missouri River, a commercially navigable waterway.

18.5. Failed to comply with recognized industry practices including those found in national consensus standards or reference guides including, but not limited to, NACE SP0502-2010; ASME/ANSI B31G-2004; and ASME/ANSI B31.4-2006.

18.6. Failed to elect to use, and document the election to use a recognized industry practice consistent with, and helping to improve, state of the art Pipeline Safety technology.

### Failure to Adhere to Gas Pipeline Safety Criteria

18.7 Failed to develop, adopt, and follow, an Integrity Management Plan with the elements required by 49 CFR § 192.1007, to identify threats, including corrosion, natural forces, excavation damage, material or wells, equipment failures, or other concerns, failure to evaluate and rank risks, failure to have in place an effective leak management program because all leaks, including the leak in question which led to the Release and injuries described in this Complaint, were not repaired when found.

18.8 Failed to survey for leaks in accord with 49 CFR § 192.723 & § 192.16, including failure to repair an identified, confirmed, and temporarily repaired leak after it was reported by Mr. Chace.

18.9 Failed to perform the necessary repair on the leak site in a safe, sound, secure and responsible manner and in accord with standard industry practices. This should have included installing a full encirclement welded

   split sleeve, properly installed and designed bolt-on-leak clamp, fillet weld over the defective area if the pressure in the line exceeded 40,000 psi (267 Megapascals "Mpa's"), or failure to apply a method that reliable engineering tests and analyses show would permanently restore the serviceability of the pipe, all in accord with 49 CFR § 192.717.

 18.10 Failed to perform tests of repairs, including failure to test as required by 49 CFR § 192.719 to the extent repairs were attempted with welding.

 18.11 Failed to provide suitable cathodic protection; this possibility requires additional discovery and investigation.  49 CFR Pt 192, Appx D.

19 Magellan admitted that at least 2,587 barrels of anhydrous ammonia was Released in the October 17, 2016 pipeline rupture.  A "barrel" is a unit measure of volume.  One barrel equals 31.5 gallons.  This means the total amount of anhydrous ammonia Released, expressed in gallons, was at least 81,490.5 gallons. In separate statements, Magellan estimated that 294,000 gallons or more of anhydrous ammonia were released from the pipeline in liquid and vapor form.

20 The Release occurred during the evening hours.  The point of Release was to the west of Mr. Chace's residence about 460 feet.

21 When the Release of anhydrous ammonia from Magellan's pipeline occurred, Mr. Chace was at home in his residence.  He awoke choking on dangerous levels of anhydrous ammonia and immediately looked outside his windows in an effort to identify what he smelled and its source.  Mr. Chace observed a cloud of material and immediately realized that an anhydrous ammonia leak from Magellan's pipeline had occurred.

22 Mr. Chace telephoned the service number for Magellan and reported the leak.  He telephoned the 911 emergency telephone services for his area, remained within the anhydrous plume to contact neighbors and arrange to block the road, and then departed from his residence.  He did so because he knew if he remained the anhydrous ammonia would be lethal to him. After he departed, Mr. Chace also called an emergency reporting point made available by Magellan.

23    When the anhydrous ammonia released, vapors moved from the Release point in the direction of both Mr. Chace's residence and the direction of the wind and land formations on at least three sides (North, South, and East) of the Release point. Mr. Chace fled, but he was exposed to anhydrous ammonia fumes in significant levels and was physically injured. His property was damaged.

### Proximate Results; Damages

24    As a direct, proximate result of the Magellan's acts and omissions, Mr. Chace sustained personal injuries, temporary and permanent impairment of his body, temporary and permanent loss of earnings and earning capacity, temporary and permanent loss of use of real and personal property, and general and special damages. Special damages are not fully known and are accruing; leave to amend this Complaint to allege all special damages then known. These are detailed, to the extent known at this point, as follows:

### General Damages

25    Mr. Chace's general damages include:

25.1 Injuries, damage and impairment to his lungs, respiratory capacity, and respiratory health, including persistent asthma like conditions, coughing, and limitations on stamina and the strength.

25.2 Injuries, damage and impairment to kidney function….

25.3 Injuries, damage and impairment to his eyes, including his corneas.

25.4 Injuries, damage and impairment to his olfactory sense and tissues of his nasal passages, and to his sense of smell.

25.5 Gout or gout-like symptoms of unremitting pain in his extremities.

25.6 Physical and mental anguish, pain and suffering.

25.7 Impaired ability to perform higher intellectual functions.

25.8 Impaired fine motor movements and fine motor muscle control.

25.9 Depression, anxiety, and disruption of emotional health.

CY9945.02

    25.10 Permanent loss of earning capacity, ability to engage in certain activities of daily living and to enjoy fully his life and the free use of his mental and physical health and capacities of his body.

### Special Damages Related to Personal Injuries

26    Mr. Chace's special damages related to his health and personal injuries include:

    26.1 Accruing expenses for medical care for primary physician services, neurological consultation, eye care, ENT consultation, psychological consultation, all of which are accruing. Current total medical expenses are estimated at $6,000. But, medical complications are expected to present themselves most predominantly at a future time.

    26.2 Mandatory medical monitoring of kidney function, health of eyes, and blood and organs for carcinogenic consequences, and medical care for acute symptoms including shortness of breath, persistent coughing, irritation in the throat, dry sore eyes, cognition impairment, olfactory impairment, and malaise.

    26.3 Anticipated permanent health care needs on an ongoing basis for the remainder of his life. Mr. Chace was born in 1964 and has a life expectancy according to the U.S. Social Security Administration at present of 26.29 years. ( https://www.ssa.gov/oact/STATS/table4c6.html)

    26.4 Lost employment, or lost employment benefits consumed by time demands associated with his personal injuries and property damage. This loss is continuing to accrue.

27    Leave is requested to amend this Complaint at the time of the Final Pretrial Conference plead the total amount of Mr. Chace's special damages.

### Special Damages to Real and Personal Property

28    Mr. Chace's special damages related to loss of real and personal property are continuing to accrue. Damages to real estate as follows:

CY9945.02

    28.1 Temporary total loss of the use of the real estate because it was unsafe and declared uninhabitable from October 17, 2016 through November 8, 2016 when he was permitted to return to it, and part-time loss of use of the residence thereafter.

    28.2 Loss in fair market value of the real estate reasonably estimated at a loss of at least 50% of its value. Before it was damaged, plaintiff believes the real estate had a fair market value of at least $10,000 per acre or a value of approximately $760,000, but after damages it is believed that the value is not greater than $380,000. The property was a specialized property commanding a high price for a specialized market, but can no longer commandments price in its damaged condition.

29  Damages to personal property have occurred and are still occurring as chemically induced damage occurs and appears over time. These are estimates based on now known and now anticipated losses based on current information:

    29.1 Damages to household goods and contents
destroyed, or damaged and not salvageable               $10,000

    29.2 Damages to machinery shed.                        $20,000

    29.3 Damages to boat, water & fishing equipment estimated at    $12,000

    29.4 Damages to grill, and outside furniture estimated at           $1,200

    29.5 Damages including electrical failures to 2015 Silverado
Truck (Still Occurring. Extent not known yet. )              $ Not Known

Leave to amend this Complaint at the time of the final pretrial conference to allege special damages as they are then known is respectfully requested.

### First Claim: Strict Liability

    30    All allegations above are renewed here.

    31    The hazardous liquid and pipeline operation conducted by Magellan was an ultrahazardous and abnormally dangerous activity transportation of anhydrous ammonia through a high pressure pipeline known to have leaked, and known to have been repaired only with a temporary repair methodology. This conduct involved

12

CY9945.02

ultrahazardous and abnormally dangerous substances and activities. It resulted in the ultrahazardous and abnormally dangerous Release of anhydrous ammonia into the atmosphere onto Mr. Chace's property, near people, and natural flora and fauna, and near or into the aquifer. Magellan had exclusive control of the devices, substances and operations of the pipeline.

32   By reason of this ultrahazardous nature and exclusive control, Magellan is strictly liable in tort for the damages proximately caused to Mr. Chace and his property. Judgment is sought for the damages proximately caused. These damages include, but are not limited to personal injuries, real and personal property damages, economic and recreational losses, out of pocket expenses, loss of quality of life, aggravation and inconvenience, and the creation of conditions that are harmful to human health and the environment.

33   These actions proximately caused the damages described above.

### Second Claim:  Negligence

34   All allegations above are renewed here.

35   Magellan was, at all times, in exclusive control of the pipeline, its contents, its controls, and all its components. The events that occurred are events of a type that could not have occurred without negligence. While Mr. Chace can identify actions that should have been undertaken, performed and completed, he cannot be certain about what acts or omissions constituting negligence were committed by Magellan. He respectfully invokes the doctrine of *res ipsa loquitur*. The pipeline and the ability to repair it were, at all times within the exclusive control of Magellan.

36   Without waiving the application of the doctrine of *res ipsa loquitur,* Mr. Chace affirmatively alleges that Magellan was negligent because it failed to perform one or more of the obligations or duties described in ¶¶ 16 – 19 above. Judgment is sought for the damages proximately caused.

### Third Claim: Inverse Condemnation

37   All allegations of ¶¶ 1 – 23 & ¶ 28 are renewed here.

38     Magellan, as a pipeline company, is empowered to exercise eminent domain and to take property for its operations. The acts and omissions of Magellan conducted and committed on October 17, 2016 and thereafter took Mr. Chace's real and personal property from him and deprived him of its use. Before it was taken, Mr. Chace's property had the values described in ¶ 28, but after was taken this value was reduced as alleged. Judgment for the difference between the before and after value, and the additional damages caused by the inverse condemnation of his property by Magellan. Judgment, and for reasonable attorneys' fees, expert witness fees, prejudgment interest, and costs are sought pursuant to *US Const* Amend. V and *Neb Const* Art I, § 21.

### Fourth Claim:   Nuisance

39     All allegations above are renewed here.

40     Magellan's actions interfered with Mr. Chace's use and enjoyment of his land and home. The Magellan interference was unreasonable, negligent, reckless, and involved abnormally dangerous conditions and activities as alleged above. This conduct constituted a private nuisance. The utility of Magellan's omissions and neglect did not outweigh the harm imposed and caused.

41      Magellan's interference was a proximate cause of damages to Mr. Chace. Those damages are as are alleged above.

### Fifth Claim: Trespass

42     All allegations above are renewed here.

43     The acts and omissions of Magellan described previously, and below, constitute a trespass, and a chemical trespass committed against Mr. Chace and his property.

44     Magellan caused or permitted its anhydrous ammonia to be Released from its pipeline and to flow over, onto, into, and across, Mr. Chace's real estate without his consent. The Released anhydrous ammonia was a deadly chemical. It is lethal to people, animals and plants, it corrodes, deprecates and damages structures, equipment and personal property, and it pollutes the land, air and structures it permeates.

45    Magellan acted willfully and wantonly and that it had reason to know of the damaged condition of its anhydrous ammonia pipeline and that the condition was a hidden danger or peril. Magellan claimed to up made repairs but knew it had not. It acted willfully and wantonly and intentionally disregarded its duty of maintenance and repair and to protect nearby property owners including Mr. Chace.

46    The anhydrous ammonia Released by Magellan did all the things described in ¶ 44 to the real and personal property of Mr. Chace. It killed his flora, drove away the wildlife, defoliated the trees and killed many of them, and corroded, deprecated and damaged his residence, other structures, equipment and personal property.

47    The full extent of this damage is not known but generally it includes the damages alleged above.

### Sixth Claim: *Resource Conservation & Recovery Act*

48    All allegations above are renewed here.

49    Title 42 USC § 6972(a)(1)(B) (Sec 7002 of the ***Resource Conservation & Recovery Act*** [RCRA]) authorizes any person to bring suit "against any person … who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." Mr. Chace is entitled to sue under this statute and he does so.

50    All Defendants qualify as "persons" under 42 U.S.C. 6903(15) that have engaged in the "handling, storage, treatment, transportation, or disposal of any solid or hazardous waste" and are therefore subject to the citizen suit provisions set forth in Section 7002 of the RCRA, 42 U.S.C. § 6972.

51    Anhydrous ammonia and its constituents qualify as both solid waste and hazardous waste under the RCRA, because Magellan disposed of the petroleum and associated constituent matter by releasing the chemicals into the environment; substances on the plaintiffs' land "pose a substantial present or potential hazard to human health or the environment…" 40 C.F.R. § 261.2; 42 U.S.C. § 6903(5)( B).

52    Magellan's RCRA violations pose an imminent and substantial threat to health and the environment because of the ongoing nature and severity of the pollution.

53    In light of the numerous, severe RCRA violations by Magellan, Mr. Chace is entitled to an Order and Judgment requiring the Magellan "take such action … as may be necessary" to abate the pollution made basis of this claim. He also respectfully claims a right to recover entitled injunctive relief, future environmental monitoring, civil penalties, litigation costs including expert witness fees, and all reasonable attorney fees. 42 U.S.C. § 6972(a),(e); 42 U.S.C. § 6928(a), (g).

## Requests for Relief

54    On the foregoing basis Mr. Chace requests judgment for:

    54.1 General damages for personal injuries including permanent injuries, permanent impairment of his body; physical and emotional distress.

    54.2 Special damages for medical expenses, and property damages and losses, which are still evolving. Leave to amend to state special damages when fully known as requested.

    54.3 Eminent domain damages, attorney's fees, expert witness fees, and costs pursuant to *US Const* Amend. V and *Neb Const* Art I, § 21.

    54.4 Prejudgment interest to the extent permitted by law.

    54.5 Taxable court costs and attorneys' fees as permitted by law.

## Jury Demand; Trial Location Designation

55    Mr. Chace respectfully demands trial by jury. He designates Omaha Nebraska as the place for trial.

March 8, 2018.

Steven Chace, Plaintiff

By: /s/ David A. Domina
David A. Domina, #11043
Brian E. Jorde, #23613
DominaLaw Group pc llo
2425 S. 144th Street
Omaha, NE 68144
(402) 493-4100
ddomina@dominalaw.com

CY9945.02